Thank you, Your Honors. May it please the Court, Patrick Collins on behalf of the appellants of the City of Burnsville, Officers Mott and Jacobs and Yakaloff. Also with me is Counsel Joe Flynn on behalf of the appellants also. Your Honors, this is a case involving qualified immunity and the use of deadly force. And therefore, the legal issue before this Court and the question is whether a reasonable officer in the position of the defendant officers would have considered Mr. Kong, the decedent in this case, could believe that he posed an imminent threat of serious physical harm or death to others, officers, or the general public. In our case, our position is that a reasonable officer... No, we're going on both. Okay. I thought that was your overview. Go ahead. No, no, no. That's the question regarding reasonableness. I would like to take them in order, but I'd be glad to talk about. And so with regard to the first prong of the qualified immunity analysis, whether a reasonable officer could believe that Mr. Kong posed a deadly threat or serious physical harm to the general public or people in the vicinity. And we believe our position is that the answer to that question is unequivocally yes. And more importantly, as Judge Benton also talked about and mentioned, that we believe there's no superbly established law that prohibited the use of deadly force under these circumstances. And those circumstances are the undisputed facts found by the District Court, which we rely upon. And those district facts are as follows. Mr. Kong refused repeated commands to drop his large knife. And even after... Oh, wait. You said large knife. I looked all through the record and no place does it say how big the knife is, right? There's no place. You've got one chart with some kind of marks by it and you can't figure out what the marks are. Is that a true story? How many inches it is or, you know, whatever? You're absolutely right, Your Honor. There is not a reference in the record as to how long the knife is. I'm... To me, it's... Do you have a witness or an affidavit that says... There's a picture of it somewhere. There's a picture but you can't tell how long it is. Because your marks are no good. I stared at it. Okay. Okay. Now, what do your witnesses say? What is the testimony here about the dead burn knife? Go ahead. Sure. Our witness is Officer Mott, who testified that... And you look at the video. He says it appears to be a long dagger in the video. And so, I will refer to it as a long dagger because that's what the evidence shows. That he refused to drop his long dagger numerous times even after being tased twice. The district court found that Mr. Kong swung his large dagger closer to and towards Officer Jacobs before exiting the vehicle. After exiting the vehicle, Mr. Kong stumbled, quickly stood up with the large dagger in his hand and fled from the police. Mr. Kong, when he fled from the police, he ran in the direction of a citizen motorist who was in the parking lot, Ms. Unterschutz, who was directly in front and a little bit to the left of Mr. Kong. He also sprinted in the direction of numerous citizens in vehicles on the frontage road and on Highway 13, which were short distances away. The district court also found that Mr. Kong's behavior was, and I want to quote this, was certainly frightening and unpredictable like the decedent in Hassan versus City, Minneapolis. She also mentioned the Schneider versus Minneapolis case. The district court also found that defendants were forced to make a split-second judgment in circumstances that were tense, uncertain, and rapidly evolving. And as this court has held numerous times, and in fact Judge Loken has held in appersmatch v. Tierney, that this court is hesitant, and I quote, to second-guess a split-second judgment of officers' work in tense, uncertain, and rapidly evolving situations. As the court is aware, the district court held that, didn't held but concluded that because Mr. Kong was, his weapon of choice was a long dagger-like knife, that he vehicles. And we disagree with that conclusion, and we believe the Supreme Court in Tennessee v. Garner. That's all thoroughly briefed. Okay. I think you took a pass at this in the brief. The district court's reliance on Wallace as requiring that the perception or that the suspect was in process of committing a violent felony. Do you agree that that is a sine qua non of a qualified immunity examination? No, I don't, Your Honor. What case would you cite for the proposition that it doesn't, it doesn't have to be a violent felony, even in a deadly force case? Actually in process. I would cite the State v. Morgan case. That was, I believe that was a call for a domestic dispute, and that was the person on the porch that had a knife, was head down by his side, I believe, and he lifted a leg. That was the friend. Okay, the friend. And he lifted a leg as if to take a step towards the officer, and they found that that use of deadly force was justified under those circumstances. I believe, and I butcher this name, but I believe this court just recently issued the Swearingen decision where the person was found with a knife in a closet. He didn't move, and the district court, this court found that that was a reasonable shooting. And as the court mentioned, that talking about decisions, the main, one of the big issues that we discussed in our brief is that the court, the district court, and the appellee has failed to cite a clearly established precedent that forbid the use of deadly force under these, under this situation. Can I, before, are you moving into the clearly established? If I can step back. It seems to me that, and we have all of the video on this, so there's multiple cameras. I don't sense a whole lot of dispute sort of factually from the parties, but it, as I was reading the district court's opinion in the briefing, it seemed to me the dispute was on the inferences that one might make from what you saw in the car. So, if I'm reading the district court properly, it viewed it saying, well, one inference to be made from this scenario that's going on in this car is that he was really having a mental health crisis. That's backed up by the telephone call through 911, a calm caller, 30 minutes in the car, sort of all of those circumstances. Is that something then, if we view it as the reasonable inferences made from those facts, does that then go to the jury? No, Your Honor. Why not? The test is what a reasonable officer would have perceived under similar circumstances, and the intent, and I think, and I don't want to put words in your mouth, but the district court seemed to rely a lot on intent. Well, Mr. Cong didn't intend to do that. No, and I would shift you off of that because I'm not necessarily convinced of that, and you can make that argument, but I'd like to focus more on not trying to get into the mind of Mr. Cong, but what the officers would have seen and the inferences from that, so that to the extent you're inferring an intent from what you're seeing, fine, but putting aside that focus. If I'm understanding your question right, whether a reasonable officer could infer something other than our argument? But there are different inferences that you can make from what was going on in that car when they arrived. I would, to answer your question hopefully the best I can, is that with regard to whether or not Mr. Cong was, if there was an inference that he may have been having a mental episode, or in our case, our officers believe that he was high on methamphetamines, the fact that he may have been having a mental episode does not foreclose the use of deadly force under these circumstances, and this court has held numerous times in Sanders and Hassan that even if a person is, had mental issues, or in our case, was high on methamphetamines, it does not foreclose the use of deadly force on that person if they are an imminent deadly threat to the people in the vicinity and around this area. And so I hope I answered your question, but our position is that whether or not he was having a mental episode, or if he was high, he was still a deadly threat to everyone in the vicinity and especially the people he was sprinting towards. And if I may just redirect back to the clearly established principle, the district court and the appellee has failed to cite one case that forbids the use of deadly force under these circumstances. They rely upon the Ludwig v. Anderson case, and the Ludwig v. Anderson case is not clearly established for two main reasons. First, it's factually different from our case. In Ludwig v. Anderson, Mr. Anderson had a knife, but he never moved towards the officers with the knife. And the district court... Didn't he run away from the officers in this one as well? Yes, and I'll get to that. Before he ran away from the officers, he never moved towards the officers with the knife. In our case, Mr. Kong, it's undisputed that he swung his knife closer to and at Officer Jacobs before leaving the vehicle. In Ludwig, Ludwig had the knife, and when he was away from the police, the further he got away from bystanders. In our case, Mr. Kong, the further he fled away from the officers, the closer he got to bystanders. That's the main factual difference. The also big difference with Ludwig is that it never found a Fourth Amendment violation. The Eighth Circuit found that there was predicate fact issues and therefore remanded it back to the district court. Under Pauley v. White, the U.S. Supreme Court decision, you have to have a Fourth Amendment violation to put an officer on notice that deadly force is forbidden under the circumstances. The Ludwig case did not find it. You're saying... I think what you're saying, but I don't know why you're not saying it directly, is Ludwig didn't consider the clearly established prong. That's correct, Your Honor, and I should have said it more clearly. I apologize. And the appellee also relies upon the Raines decision, which was issued by this court in 2018, as allegedly clearly established precedent. Well, this incident happened in 2016, and by definition, it couldn't provide clearly established or put the officers on notice of anything. And further, that case was also dismissed for lack of jurisdiction. Does that mean we should ignore Casella too? No, Your Honor. Casella... What's the difference? The Supreme Court case in Casella, that was decided on the clearly established prong, correct? Yeah. Okay. And that's what we're asking the court to do here too, is that not only was it reason... But you're saying we have to ignore Raines because it was afterward. No, I see what you're saying. Raines is a clearly established precedent or not. Yes, it's not, Your Honor. And to answer your question regarding Casella, they specifically, I believe in that case, said that although... I believe they cited cases that happened after the fact, and they said, but these principles were longstanding at the time of the incident. And so that's the difference between that case and Raines. And I see that I'm into my rebuttal time, and I'll reverse the time for rebuttal. Thank you, Your Honors. Thank you, Mr. Student. Good morning, Your Honors. Counsel, may it please the court. I'd like to start with the jurisdictional issue here, as this is an interlocutory appeal. Well, we've done that 50 times since. I mean, let's talk about what's been argued. Sure. You briefed that, they didn't argue it. Correct. I think to address the Raines case first, well that's... I'd like you to address Casella. If you can't distinguish Casella on the clearly established prong, your rock isn't getting up the hill. In Casella, factually, what was at issue was an individual who the officer is on scene reasonably perceived to be moving closer to another individual who is within 10 yards or so, and would have gotten to that individual within mere seconds. Um, this case is different because Mr. Kong was running away. He was running toward occupied vehicles. And I think in that respect, this case is closer to Ludwig on the facts than it is to Cancilla. And Ludwig is not clearly established precedent. I think once Ludwig was decided in 1995, that was the clearly established precedent that gave notice to the officers in this case. Did Trump, Hassan, and Bali, all the ones that have come since? I don't believe there's any case that's undermined Ludwig. And I think that case has been cited 475 times by the district court's count. And I think it still stands for the proposition that an individual fleeing the police with a knife who may be emotionally disturbed, deadly force is not authorized unless there's something more going on. And in this case, there's a factual dispute as to whether there was more going on. The video evidence, I believe, shows that Mr. Kong did not, in fact, attempt to assault any officers. I think on that point... Well, he kind of waves the knife toward him, right? He's waving the knife in many different directions. Yeah, he waves it toward them at the window, right? Only fair viewing of the... You know, we're in the video business. That's the only fair reading of the video, right? To the extent that you're using the word towards as a directional... Yeah. ...rather than an intentional. Well, now, his intent doesn't matter, right? That's what Frederick versus Motzinger, I think it is. And several other cases say it's not his intent that matters. Go ahead. Yes, it's what the officers objectively see about the individual on the scene. So I believe in Ludwig, the suspect there was, in fact, making what the officers perceived as threatening motions with the knife. He was hopping back and forth with the knife before he fled. And in Ludwig, the suspect fled towards, across the street, towards an apartment building where he would have been in contact with citizens. The district court made the point in this case that the potential violation here, the case is even stronger because Mr. Kong was running towards individuals traveling at highway speeds in their vehicle. Aren't there a couple of... Again, I'm trying to remember the video. There are a couple of cars back there that stopped. And throughout this encounter, it's a lot of traffic back there and a lot of stopped traffic back there. I was surprised at how many people came right back there during the middle of all this. What do you say to that? That's true. And the McDonald's parking lot certainly had people circulating in and out. And some stopped, for sure. Yes, I believe at the time that Mr. Kong exited his vehicle, the Unterschutz vehicle was moving away. And Mr. Kong was moving away from the Unterschutz video, notwithstanding the defendant officer's arguments here. I think that's made clear. Well, look at the video. I thought it was stopped when he exited the vehicle. The surveillance video from the Ride Audio, the neighboring business, shows that the Unterschutz vehicle was, in fact, moving in contrast to what their forensic analysis might show, which is based on factual presumptions that, you know... Do you believe that the factual record is largely not in dispute? I think the two key factual disputes here are whether Mr. Kong attempted to assault or committed any other violent crime while at the scene. Or whether a reasonable officer would believe that. Correct. And the video... Is that... that's a factual...? It is. And on that point, the Raines case provides, I think, good guidance because there is video in that case from... I don't know if it's squad video or body camera video that was inconclusive as to whether Mr. Raines, I believe was the individual, made a move towards officers or not when deadly force was employed. And in the Raines case, this court... Can we use the Raines case for anything in this case? We can't use it for the qualified immunity issue, for the clearly established precedent. But I think it provides guidance as towards the legal standard viewing the evidence at this stage in the proceedings. And as we know, at summary judgment, the evidence, all inferences need to be drawn towards the plaintiff. And in that case, the appeal was dismissed by the Eighth Circuit given the disputes surrounding the video evidence. So how would the testimony go then? Are you saying that then at the trial, the officers would testify that, yes, I don't know, the dagger did go through the window and that was an assault on me? Because there's no other testimony, right? It seems to me it's, again, to, I guess, parrot what I was talking about with your opposing counsel. It's more of an inference of what actually was going on there as opposed to did someone step forward or step back? I think that's true, although the district court did note in its opinion that none of the officers in their interviews with the BCA shortly after the incident, none of the officers said that Mr. Kong attempted to assault Officer Jacob. How do those interviews work? Is that a question that they're asked? Is that something that's normally a part of that interview? Would that be something that, and maybe you're not the one to ask this, but is that something that would naturally come up as an explanation of what happened? It is something that should naturally come up because it's critical to the analysis of whether deadly force is authorized. And that's something that presumably the Minnesota BCA should be asking every officer involved in a deadly force case. None of the officers here, despite the fact they were represented by counsel at their BCA interviews, made any reference to any attempted assault. And that's consistent with the video evidence, including the video evidence from a bystander who was inside the McDonald's, that doesn't show the officers react to this supposed assault as an assault. They continue on as they had before in response to Mr. Kong waving the knife in every direction while he was contained in his vehicle. I think that's a matter that a jury is going to have to decide whether there was in fact a legitimate, something that officers could have reasonably perceived to be a legitimate attempted assault. I don't think that's essential to qualified immunity. I think that the protracted conduct in the car, leaving the car when maced, picking up the knife and running toward unoccupied vehicles, ignoring repeated commands to stop, that's the question for objectively reasonable police officer using of deadly force. And I think before you can conduct that analysis, the predicate facts do need to be determined by a jury. Why? Whether Mr. Kong did in fact run towards a vehicle that was in the parking lot. And there's evidence that he was not in fact doing that. We're going to have interrogatories now to the jury? I think it would be a matter of... This is what Harlow v. Fitzgerald wants. This is what all of the qualified immunity decisions from Casella back to White v. Polly, but back to the last five or six Supreme Court decisions in the last 10 years all want to have happen. And I think Wallace v. Al... Wallace is asking us to ignore what the Supreme Court's been preaching. I don't think the Casella decision undermines the takeaways from, for example, Wallace v. Alexander, where the Eighth Circuit held that there was a fact issue as to whether the suspect there attempted to assault an officer. And that was a critical component to determining whether deadly force was authorized. I don't... If he doesn't get up off the pavement with his knife and run toward other members of the public, then this is... I doubt that they'd have shot him. It certainly would be a different deadly force case. That's true. I think a lot of things would make this deadly force. It's protection... In a split-second situation, were they objectively reasonable thinking that other members of the public at a McDonald's parking lot abutting a crowded service road in early rush hour were in danger? And I think whenever you have a deadly force case in a metropolitan area, and I fall back on Ludwig, I think whenever you have somebody who's fleeing with a knife, that's always the argument that officers can make, that this person was a threat to the public. The question is, was this person an imminent threat? And I think Ludwig instructs us that it was not, on one end. On the other end, you have Cancilla. If someone's within 5, 10 feet and begins moving towards someone else with a knife, specifically towards that person. The other person said, oh yeah, don't worry about it. Okay, as you look at the video, how close does he get to some other car? That's tough to say. I think he gets within 20, 30 feet, but he's on a different vector. He doesn't change direction, which would have given the officers an idea that he was intending to go towards that vehicle. Because you're aware, Scott V. Harris, we're in the business of looking at these videos. And don't you think, and Judge Kelly's asked it, I'll ask it a different way. Don't you think at this stage of the litigation is to look at the video and decide? Yep, and I think it's for the jury to review the video. Well, now wait, Scott V. Harris says the opposite, my friend. Don't you think, you know what I'm referring to, Scott V. Harris does. Yes, you do. Doesn't Scott V. Harris put us in that business? It does where the video is not disputed. In cases where the video is disputed, then the Reins line of reasoning applies. And in Reins... Well, it's whether the facts are blatantly contradicted. I think I'm quoting it by the video. I'm talking about Scott V. Harris. Yes, you're correct. Okay, now, so here, what is blatantly contradicted? Oh, and the blatantly contradicted, that goes to the district court's assessment of the video. Well, that's us too, though. Scott V. Harris is certainly directed to circuit courts. You agree? Yes, yeah. Okay. So tell me what the videos don't give us. Well, in this case, the district court held that it's unclear... No, no, don't tell me about the district court. Tell me the real thing that the videos don't give us. Don't tell us about this situation. The videos don't clearly show Mr. Kong attempting to assault an officer. It shows him swinging the knife around before the officers get there. The officers perceived this as Mr. Kong was in distress. He needed help. Defendant Mott at his deposition said Mr. Kong needed help. They then proceeded to break the windows out in contradiction to their CIT policy, and that goes to the state law negligence claim, but I think that's well enough briefed where we don't need to address it here unless the court would like to. Okay, what else is not in the video? Mr. Kong running towards a vehicle that stopped or moving on the frontage road. He's running generally towards the traffic on Highway 13 that's moving at highway speeds. He's not running towards an intersection. Wait, there's a stop sign there and a stop light. Highway speeds? Yes, highway speeds. There's the access road, right? I've looked at your diagram. There's a frontage road. There's a McDonald's parking lot. And there's a stop sign pretty close to there and then a stop light on it. To the left. And Ms. Unterschutz was moving towards the stop sign. Mr. Kong... So it's not at highway... I don't know what you mean by highway speeds. That's what alerted me to... The actual vehicles that he was running towards were vehicles generally on Highway 13 that were traveling at highway speeds. That's the fact that the district court found. In the frontage road between him and... Tell me if I don't understand the roads. I looked at the diagram. But there's a frontage road where the traffic basically stops, right? Before you get to 13? There was a frontage road, but there were no vehicles traveling on the frontage road at the time that he was attempting to flee. Okay, at that very moment he starts... At that moment. Before he fled, there were certainly vehicles circling the parking lot on the frontage road. But as the district court found, there were no pedestrians about. And the only vehicles that he was running towards generally were the vehicles traveling at highway speeds on Highway 13. With respect to the negligence claim under state law,  as to the officer's intent to disregard their crisis intervention policy, the depositions and the BCA statements make it clear that the officers believed Mr. Kong was in fact having a mental health crisis. The specific ideology of that crisis, whether it's drug-induced or mental health-based or a combination of both, which it was, that's irrelevant to the analysis of whether the policy applies. And what you do once you know the policy applies. And they knew the policy applied. And what they did starkly contrasted to what they were supposed to do under the policy. And based on that, the district court held that it's a fact issue. And these fact issues are typically for the jury to decide in official immunity cases. And thus the district court was correct in denying summary judgment on the official immunity basis. Barring any further questions, I have nothing further. Thank you. Thank you. For rebuttal, excuse me, Mr. Collins. Yes, I probably won't take all my rebuttal time. But I just, from listening to the appellee's argument, he still has not cited a clearly established law that forbid the use of deadly force under these circumstances. And he claims Ludwig is. I mean, he says Ludwig several times. Yes, and I disagree that Ludwig is because of the reasons that I stated is factually different. That in Ludwig, Mr. Ludwig never moved at the officers with the knife. Mr. Ludwig, when he ran away from the officers, the further he got away from the officers, the further he got away from bystanders. And in our case, the further Mr. Kong fled away from the officers, the closer he got to people and vehicles. That's undisputed. And also, again, Ludwig didn't find a Fourth Amendment violation. It simply found that there was a disputed fact that the district court should determine. And I agree with Judge Benton that the videotape shows everything that's been needed. The district court found the undisputed facts based on the videotape. And based on those undisputed facts, we'd ask that this court reverse the district court's decision and grant the officers qualified immunity. Thank you. Thank you, counsel. The case has been well argued and well briefed and raised and said. These are always troubling cases and they're never easy and we'll take every item.